559 So.2d 963 (1990)
James H. RIVERS and Jack L. Rivers, Plaintiffs/Appellants,
v.
SUN EXPLORATION AND PRODUCTION CO., et al., Defendants/Appellees.
No. 21324-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 1990.
*964 McKeithen, Wear, Ryland & Woodard by George M. Wear, Columbia, for plaintiffs.
Dotson, Babcock & Scofield by Robert O. Thomas, Houston, Tex., for defendant Standard Oil Production Co.
Madison, Garrett, Brandon, Hamaker, Wilson & Tugwell, by John W. Wilson, Monroe, for defendantSun Exploration and Production Co. and Murphy & Munoco Co.
Blanchard, Walter, O'Quin & Roberts by J. Jay Caraway, Shreveport, for defendantVaughan Petroleum, Inc.
Before FRED W. JONES, Jr., LINDSAY and HIGHTOWER, JJ.
FRED W. JONES, Jr., Judge.
Plaintiffs, James H. Rivers and Jack L. Rivers, appealed the partial summary judgment granted by the trial court in favor of defendants, B.P. Exploration, Inc., formerly known as Standard Oil Production Company and Sohio Petroleum Company (hereinafter referred to as Sohio), and Oryx Energy Company, formerly known as Sun Oil Company and Sun Exploration & Production Company (hereinafter referred to as Sun), finding that plaintiffs' demand letter for the payment of royalties was not sufficient notice pursuant to La.R.S. 31:137 to support plaintiffs' claim for the penalty of double the amount of royalties, interest, attorney's fees and lease cancellation. For the reasons stated herein, we affirm the judgment of the trial court.
Issues Presented
On appeal, plaintiffs assert the following assignments of error:
1) The trial court erred in finding that plaintiffs' letter to the lessees containing a written demand for an accounting and payment for all production saved and marketed during the three years prior to March, 1985 under specified leases was not sufficient notice under La.R.S. 31:137 to commence that article's 30 day period for compliance of the lessees; and,
2) The trial court erred in finding that the facts of the case did not warrant the assessment of penalties to the lessees when the lessees were given the described notice, failed to give an accounting, failed to pay royalties which were then owed and failed to give any reason for non-payment in response to the notice.
Factual Context
In this mineral law litigation, evidence pertinent to the judgment appealed shows plaintiffs owned mineral interests in the Benton and South Sarepta Fields in Bossier Parish, which they acquired from Welori Lumber Company in 1977. Sohio was a co-lessee of the Rivers' interest with Sun and later Sun's assignees. Sun was the operator of the Hosston "A" Sand Unit and Vaughan Petroleum, Inc. (hereinafter referred to as Vaughan) was the operator of the Hosston 6014' Sand Unit and the Benton Field Unit. In late 1984 and early 1985 the two Rivers noticed that their royalty for gas produced from the Hosston "A" Sand Unit was reported under two different owner numbers and on January 9, 1985 they wrote to Sun to question why the royalty from this unit was being reported in this manner. Sun responded that Sun and Sohio marketed their respective shares *965 of gas produced from that unit at different prices pursuant to different contracts. As half of the gas was marketed at one price and the other half was marketed at a different price resulting in a product price differential, it was necessary to create two owners numbers so that the royalties could be paid based upon the actual price received for the gas.
In a letter dated March 19, 1985 the two Rivers made formal demand upon Sun, Sohio, Murphy Oil Corporation, Munoco Company and Barco Company, for the payment of royalty in compliance with the leases in the South Sarepta and Benton Fields. In their letter, plaintiffs stated they noted their royalty interest in the Hosston "A" unit was being paid at different rates and reviewing the royalty provision of the leases on a substantial part of the unit indicated this division of royalty would be contrary to the obligations of the leases. This deficiency in royalty payment was brought into clear focus as plaintiffs were also working interest owners in the unit and were receiving for their share of the unit production a substantially higher price than that indicated for one-half of the royalty production. Plaintiffs further stated they now believed the deficiency in royalty payments was not limited to the one unit and one lease made subject to their prior demands, but was in fact applicable to several leases in which the Rivers were the lessors.
The letter demanded that within 30 days of receipt of the demand, the royalties provided to be paid under each of the six leases on the property should be paid and accounted for at the maximum price any owner of an interest of the lessee under a lease had received for its plant's products, residue gas, gas and condensate marketed or used from the leased lands or allocated to the leased lands from unit production. The letter described the six leases on the property which were executed from January 15, 1944 to December 9, 1975. The leases covered lands in both the Benton and South Sarepta Fields that were in units established by orders of the Commissioner of Conservation. The royalty obligation of the lessees named in each of the leases was substantially the same. The letter also stated it was a demand for an accounting and payment for all production saved and marketed during the three years prior to March, 1985. Plaintiffs stated that in the event payment of the deficiency in royalty was not made within 30 days after the receipt of the demand, an action would be filed on behalf of the Rivers seeking a judgment that ordered the payment of royalty in accordance with the leases as well as penalties, interest and attorney's fees and cancellation of the lease on which the royalty payment had not been made in accordance with the lease.
Upon receipt of the letter, Sohio examined its records and those of Sun and Vaughan to confirm the royalties had been paid in accordance with the leases and discovered a clerical error had occurred which resulted in an underpayment to the Rivers in the amount of $339.41. This amount was promptly tendered to the plaintiffs-lessors. Sohio determined that plaintiffs' royalties had been properly paid based upon the price actually received for Sohio's share of production and responded to plaintiffs' demand by explaining that plaintiffs had received a higher rate of royalty from Sohio's share than was specified in the lease since the inception of the lease and with the exception of the underpayment caused by clerical error, royalties had been paid on a basis that equaled or exceeded that required under the leases. Sun responded to the demand letter advising plaintiffs that it, as a lessee and as the operator, believed that to the best of its ability royalties were paid to the royalty holders on the basis provided for in the respective leases.
It appears from the record that the lessees contacted by plaintiffs construed their demand letter to be the single issue of whether royalty should be based on the actual price received by each lessee or on the highest price received by any lessee when the working interest in a mineral lease was co-owned by several lessees.
In verifying whether all royalties due to plaintiffs pursuant to the leases had been paid, Sohio discovered Vaughan had placed a portion of the proceeds of production from the Benton Field Unit in suspense *966 because of its concern that the Federal Energy Regulatory Commission might order a refund to the purchaser of all or part of the suspended proceeds. These proceeds included amounts due to Sohio as a working interest owner as well as royalties due to Sohio's lessors. Sohio demanded Vaughan release these funds and Vaughan paid plaintiffs' royalties in the amount of $15,451.25 on July 15, 1986. On October 3, 1985 Vaughan had also tendered a check to plaintiffs in the amount of $27,303.33 representing royalties on production obtained from the Hosston 6014' Sand Unit and the Benton Field Unit between June, 1982 and July, 1985 which had been suspended by Vaughan because of the Rivers' alleged failure to respond to Vaughan's request that they execute a division order.
On June 7, 1985 plaintiffs instituted this action for unpaid royalties allegedly due, naming as defendants, Sun, Sun Oil Company, Murphy Oil, USA, Munoco Company, Bill Reyenga d/b/a Barco Company and Sohio. Plaintiffs alleged they had acquired all the oil, gas and other mineral rights owned by Welori Lumber Corporation in a conveyance of mineral rights dated May 12, 1977. The records of Welori Lumber Corporation indicated payments were being received from Sun Oil Company for production obtained from wells in the South Sarepta and Benton Fields and a copy of the conveyance of mineral rights was forwarded to Sun Oil Company with the request that the records be changed to show plaintiffs as successor owners of the interest conveyed. Plaintiffs asserted that Sun was the successor and subsidiary of Sun Oil Company and as a successor-lessee it had a responsibility to plaintiffs for royalty payments under the leases. Plaintiffs contended their royalty interest was based on plaintiffs' mineral interest having been leased by their predecessor under six separate mineral leases. Plaintiffs alleged that rights of the lessees in the leases were co-owned in several of the leases by reason of grant of the lease to multiple lessees and, as to other leases, grant to a single lessee that had either been liquidated or merged. Plaintiffs asserted that co-ownership of the rights of the lessees had resulted from assignment or sub-lease of an interest of the initial party lessee.
Plaintiffs alleged that in 1977 they attempted to obtain from Sun Oil Company information as to the marketing arrangements for production obtained from the lands subject to the leases and from the units in which any of the lands were included. In response to these inquiries, the contract Sun Oil Company had with Reynolds Metal Company for production from the South Sarepta Field was furnished but no other information was made available to plaintiffs as to the basis for royalty settlement. Plaintiffs further alleged that in 1984, Sun commenced to provide a more complete accounting and from this accounting it was noted that the defendants had divided the royalty interests on a unit in the Benton Field into two interests and accounted for royalty production on a different basis. Plaintiffs contended they had learned that royalty payments had been based on the price at which each co-owner of a lessee's interest elected to account to the royalty owner for a part of production from the lease without giving any consideration to the fact that production from the lease was being marketed at a higher price than the price at which a co-owner elected to pay royalty, and that royalty production could be marketed at such higher price than was actually being paid for production obtained under the lease. Plaintiffs said they had made a demand for royalty payment by demand letter dated March 19, 1985, which demand was ignored by defendants. Plaintiffs claimed they were entitled to recover from defendants the royalty payment that defendants as lessees contracted to pay plaintiffs as lessors on production obtained under each of the leases that had not been paid and in addition, penalties, interest and attorney's fees authorized by law when a lessee failed to pay a royalty owing after demand, including the penalty of dissolution of the lease on which the lessees have failed to pay royalty. It was contended that the amount owing for royalty by reason of the alleged default of defendants in paying royalty in accord with the obligation of lessees under *967 the leases was not determinable from the accounting provided by defendants with the payments made and would not be fully determined until there was discovery from the records of defendants as to the maximum price at which the production from each lease could be marketed during each month and thus the deficiency in royalty payment by reason of lessee paying royalty at a rate below the price at which production from the lease could be marketed during the month.
Plaintiffs filed a motion for partial summary judgment seeking double the amounts paid to them by Vaughan in October, 1985 and July, 1986 as penalties for late payment of these royalties. The motion for partial summary judgment related only to lease numbers 4 & 5 in the Benton Field and was denied by the trial court.
Sohio then filed a third-party demand naming as defendant, Vaughan. Sohio alleged Vaughan was the operator of the Benton Field Unit and the Hosston 6014' Sand Unit and Sohio was a non-operator working interest owner in both of the units. As operator of the units, Sohio asserted Vaughan had agreed to collect the gross proceeds of the production and to distribute such proceeds to the working interest and royalty owners. Sohio claimed Vaughan was liable to it for any interest or penalties which might be assessed to Sohio due to Vaughan's failure to properly and in a timely matter distribute to royalty owners the proceeds of the gas produced from the units. Sun also filed a third-party demand naming Vaughan as defendant, alleging that by act of assignment it had assigned to third-party defendant all of its interests in the leases and production therefrom in the Benton Field Unit and, thus, should there be any judgment rendered against it, there should be judgment in its favor and against Vaughan for the same amount.
On January 27, 1989 Sohio filed a motion for partial summary judgment which forms the basis for this appeal, alleging that all times material to plaintiffs' petition Sun was the operator of the Hosston "A" Sand Unit and Vaughan was the operator of the 6014' Sand Unit and the Benton Field Unit. Sohio alleged it and Sun were co-lessees of plaintiffs' interests in the Hosston "A" Sand Unit and as such they marketed their respective shares of the gas produced from that unit at different prices pursuant to separate contracts with the same purchaser, Reynolds Metals Company. Sohio asserted it and Sun computed royalties payable to plaintiffs based on the price they actually received from Reynolds. Sohio stated plaintiffs had filed a motion for partial summary judgment seeking a judgment for double the amount of the two Vaughan payments as damages and cancellation of their mineral leases because of Vaughan's failure to pay royalties when due. Although the motion was overruled, plaintiffs had thereafter consistently maintained they would seek such relief upon trial of the merits. Sohio alleged that plaintiffs' petition was devoid of any allegations or prayer which would support such relief and these issues were raised for the first time in plaintiffs motion for a partial summary judgment. Sohio argued that plaintiffs' written demand for payment of royalties from the Hosston "A" Sand Unit at the maximum price received by any co-lessee was insufficient to put Sohio on notice of plaintiffs' intent to seek damages and lease cancellation for Vaughan's untimely payment of royalties. Plaintiffs only notice with respect to the later claims was served after this lawsuit was instituted and after all the past-due royalties had been paid. Sohio contended it should not be cast in damages for double the amount of the Vaughan payments nor deprived of its interest in the underlying leases because of Vaughan's untimely payment of royalties from the Hosston 6014' Sand Unit and the Benton Field Unit.
Sun also filed a motion for partial summary judgment alleging it had divested all interest in the Hosston 6014' Sand Unit and Benton Field Unit by assignment to Vaughan in 1978 and has had no interest in those properties since that time. Sun adopted all the factual allegations contained in Sohio's motion for a partial summary judgment.
*968 After a hearing, the trial court granted the defendants' motion for a partial summary judgment finding that plaintiffs' demand letter was vague and there was a lack of clear notice to the lessees. The court stated these factors did not warrant the assessment of the discretionary penalties of double royalties and lease cancellation. There are no written reasons for judgment contained in the record.
Sufficiency of The Demand Letter
A motion for summary judgment should only be granted where the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the mover is entitled to judgment as a matter of law. La.C.C.P. Art. 966.
La.R.S. 31:127 provides that the lessee's interest in a mineral lease may be assigned or subleased in whole or in part. To the extent of the interest acquired, the assignee or sublessee acquires the rights and powers of the lessee and becomes directly responsible to the original lessor for the performance of the lessee's obligations. The assignor or sublessor is not relieved of his obligations or liabilities under the mineral lease unless the lessor has discharged him expressly and in writing. La.R.S. 31:128 and 129.
La.R.S. 31:137 et seq. establishes the procedure to be followed by a mineral lessor seeking the proper payment of royalties:
§ 137. If a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he must give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease.
§ 138. The lessee shall have thirty days after receipt of the required notice within which to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment. The payment or nonpayment of the royalties or stating or failing to state a reasonable cause for nonpayment within this period has the following effect on the remedies of dissolution and damages.
§ 139. If the lessee pays the royalties due in response to the required notice, the remedy of dissolution shall be unavailable unless it be found that the original failure to pay was fraudulent. The court may award as damages double the amount of royalties due, interest on that sum from the date due, and a reasonable attorney's fee, provided the original failure to pay royalties was either fraudulent or willful and without reasonable grounds. In all other cases, such as mere oversight or neglect, damages shall be limited to interest on the royalties computed from the date due, and a reasonable attorney's fee if such interest is not paid within thirty days of written demand therefor.
§ 140. If the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, the court may award as damages double the amount of royalties due, interest on that sum from the date due, and a reasonable attorney's fee regardless of the cause for the original failure to pay royalties. The court may also dissolve the lease in its discretion.
The Official Comment to La.R.S. 31:137 states it was the intent of Mineral Code Articles 137-140 to provide the lessors with a meaningful remedy while simultaneously giving operators who have made substantial investments in producing properties the security of title which the nature and size of their investment deserves. It is noted that lessors are entitled to some meaningful remedy besides recovery of interest which will assure they will receive timely payment of the production royalties but, on the other hand, the harshness of canceling a lease which may involve the investment of millions of dollars because of nonpayment of an insignificant sum of money is obvious. The Comment further notes that Mineral Code Article 137 contemplates that at any time there has been a nonpayment of royalties, the lessor must notify the lessee. It is not intended that this notice be a demand for performance as in the case of the traditional default under the Louisiana *969 Civil Code since the lessor may not desire performance. Rather, the device of notice is merely to inform the lessee he has not paid royalties deemed by the lessor to be due. Article 138 allows the lessees 30 days within which to respond to the notice either by paying or stating a reasonable cause of nonpayment. Payment or nonpayment or stating or failing to state a reasonable cause for nonpayment in response to the notice has consequences for the lessor and lessee as to the remedies available pursuant to the Mineral Code. The total effect of the articles is to provide a spur to timely payment of royalties due while giving lessees a reasonable way in which to avoid the harsh remedy of cancellation.
This statutory scheme evidences a legislative determination that a mineral lessor does not have a right of action to judicially complain of the failure of his lessee to make timely or proper payments of royalties until he gives written notice of such failure to his lessee and allows him 30 days after receipt of the required notice to either pay the royalties due or state the reasonable cause for nonpayment. The notice requirements set forth in La.R.S. 31:137 are an indispensable prerequisite to a judicial demand for dissolution of the lease or damages. The 30 day notice period requirement affords the lessee an opportunity to evaluate the nonpayment problem and then to make an informed decision as to whether the accrued royalties should be paid. Fuller v. Franks Petroleum, Inc., 501 So.2d 1024 (La.App. 2d Cir.1987); Bailey v. Franks Petroleum, Inc., 479 So.2d 563 (La.App. 1st Cir.1985); Acquisitions, Inc. v. Frontier Explorations, 432 So.2d 1095 (La.App. 3d Cir.1983); Willis v. Franklin, 420 So.2d 1243 (La.App. 3d Cir. 1982); Rebstock v. Birthright Oil & Gas Company, 406 So.2d 636 (La.App. 1st Cir. 1981), writ denied, 407 So.2d 742 (La.1981), and Arceneaux v. Hawkins, 376 So.2d 362 (La.App. 3d Cir.1979).
The very narrow issue presented by this appeal is whether the March 19, 1985 demand letter constituted a sufficient notice and demand to satisfy the requirements of La.R.S. 31:137 and thus to support an award of penalties, attorney's fees, interest and cancellation of the lease to plaintiffs pursuant to La.R.S. 31:138-140. Plaintiffs generally argue the letter was sufficient notice and the trial court erred in holding otherwise. We disagree.
The Mineral Code contains no specific guidelines as to the precise requirements of the formal written demand set forth in La.R.S. 31:137 but instead only generally requires the lessor "give his lessee written notice of such failure" to make timely and proper payment of royalties. Further, the jurisprudence has not established any specific requirements for the sufficiency of that notice. Based upon our review of the Mineral Code and the jurisprudence, it appears the adequacy of the notice is determined on a case-by-case basis giving due consideration to the particular facts of each case.
The Mineral Code clearly establishes that the lessee has the obligation to make timely payment of royalties to the lessor. La. R.S. 31:123. Given the clear existence of this duty on the part of the lessee it would seem the demand for payment of the lessor required by La.R.S. 31:137 must be something more than the mere recitation of the lessee's contractual and statutory duty to pay royalties. If the demand requirement was only the lessor's general statement to pay royalties then lessee would be at a severe disadvantage as any prudent lessor would regularly and routinely send out such a general demand regardless of whether he knew of any specific problem with the payment of his royalties. This would defeat the obvious purpose of La. R.S. 31:137 which is to give the lessee reasonable notice of a problem or deficiency with the payment of royalties and the opportunity to correct it. Therefore, it seems apparent the intent of the Mineral Code is that the notice be of a more specific nature so as to reasonably alert the lessee and to allow for an appropriate investigation of the problem by the lessee.
In this case, the five page demand letter written by plaintiffs began with the rather detailed recitation of the lessors' concern over some discrepancy in the price paid for production. The obvious import of that *970 letter is that the lessors felt they were receiving something less than a fair price for the production from the Hosston "A" Sand Unit and specifically demanded "royalty on production be paid at the highest rate a lessee under each lease has marketed the plant products, residue gas, gas and condensate produced from the leased lands or unit production allocated to the leased lands ..." Although the March 19, 1985 letter went on to demand payment for all production saved and marketed for the three year period prior to March, 1985, the lessees could have reasonably concluded that the letter was intended as notice of the alleged deficiency in the price and was not a notice of any deficiency or failure to pay for production. The manner in which this notice was drafted was such it may have motivated these two defendants to investigate only the pricing issue. In fact, the correspondence from these defendants indicates this was precisely the interpretation they placed on this demand letter and it appears any investigation undertaken by these defendants had been directed to this issue rather than a deficiency in royalty payments. As we find this interpretation was reasonable, we believe it would be error to penalize these defendants for failing to completely audit the payment and production records as opposed to merely investigating the pricing issue. Accordingly, we find that the trial court did not err in concluding there was no genuine issue of material fact concerning the lack of clear notice to the lessees required by La.R.S. 31:137 so as to entitle plaintiffs to an award of penalties, interest, attorney's fees and cancellation of the lease, and that the notice was insufficient as a matter of law.
Decree
For the reasons set forth herein, the judgment of the trial court against plaintiffs, James H. Rivers and Jack L. Rivers, granting the motion for partial summary judgment filed by defendants, B.P. Exploration, Inc., and Oryx Energy Company, is AFFIRMED.