# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 09-1417 consolidated with 10-46, 10-308


**REDAR, LLC, ET AL.**

**VERSUS**

**WARREN RUSH, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 108435-D
HONORABLE JAMES RAY MCCLELLAND, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ELIZABETH A. PICKETT
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Jimmie C. Peters, Marc T. Amy, Elizabeth A. Pickett and David E. Chatelain[*], Judges.

**MOTION TO STRIKE GRANTED.**
**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**
**MOTION TO REMAND DENIED.**


**Amy, J., concurs in the result.**

**Saunders, J., dissents with written reasons.**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**David John Calogero**
**Davidson, Meaux, Sonnier & McElligott, LLP**
**P. O. Drawer 2908**
**Lafayette, LA 70502**
**(337) 237-1660**
**Counsel for Defendants-Appellants:**
**St. Lafayette Properties, LLC**
**Iberia Enterprises, LLC**

**Michael Wayne Adley**
**Judice and Adley**
**P. O. Drawer 51769**
**Lafayette, LA 70505-1769**
**(337) 235-2405**
**Counsel for Defendant-Appellee:**
**Warren D. Rush**

**Warren D. Rush**
**Attorney at Law**
**P. O. Box 53713**
**Lafayette, LA 70505-3173**
**(337) 235-2425**
**Counsel for Defendant-Appellee:**
**Rush Rush & Calogero**
**Warren D. Rush**

**David S. Daly**
**Scott F. Davis**
**Allen & Gooch, ALC**
**3900 N. Causeway, Ste 1450**
**Metairie, LA 70002**
**(504) 836-5200**
**Counsel for Defendant-Appellee:**
**Greenwich Insurance Company**

**D. Reardon Stanford**
**Hoyt & Stanford**
**315 S. College, Suite 165**
**Lafayette, LA 70503**
**(337) 234-1012**
**Counsel for Defendant-Appellee:**
**Norris P. Rader, III**

**Fredrick R. Tulley**
**Andree Matherne Cullens**
**Taylor, Porter, Brooks & Phillips, LLP**
**P. O. Box 2471**
**Baton Rouge, LA 70801**
**(225) 387-3221**
**Counsel for Plaintiff-Appellee:**
**Redar, LLC**
**Patsy Marsalis Rader**
**Rader Family Qualified PersonalTrust**
**Norris Rader, Sr.**

**Jennifer E. Frederickson**
**Stemmans & Alley, PLLC**
**2798 O'Neal Lane, Suite B3**
**Baton Rouge, LA 70816**
**(225) 752-5266**
**Counsel for Defendant-Appellee:**
**Norris P. Rader, III**

**PICKETT, Judge.**

Norris and Patsy Rader and their family owned two corporations that operated stores, Norris Rader, Inc. and Norris Rader of St. Martin, Inc. The stores took out loans from St. Martin Bank and Regions Bank, and Norris and Patsy Rader both personally guaranteed the notes. When the stores shut down and the corporations entered into bankruptcy, St. Martin Bank and Regions Bank took action to collect on the personal guarantees, as Norris and Patsy Rader had extensive real estate holdings. In an effort to protect those assets from seizure by the bank, the Raders transferred the family home to the Rader Qualified Personal Residence Trust (Rader QPRT), naming the Raders' children as the beneficiaries and Patsy Rader as the trustee. The rest of their property was transferred to Redar, LLC, a limited liability company owned by a second trust named the 2002 Norris and Patsy Rader Trust, whose beneficiaries were the Raders' children. The banks were suspicious of these transfers, and began to take steps to attack the transfers.

The Raders went to Warren Rush, an attorney in Opelousas, seeking advice on how to keep their property from being seized by St. Martin Bank and Regions Bank. Rush concocted a scheme, which the trial court explained in its reasons for judgment:

> On October 16, 2002, St. Martin Bank filed a petition for executory process, to seize and sell the Rees Street store in Breaux Bridge in order to satisfy an indebtedness of $1,192,443.07 plus $41,858 interest through July 25, 2002, plus interest thereafter at 7.75% annually, plus $255 attorney's fees. St. Martin Bank advised Mr. Rush by letter from the bank's president that they had a strong case against Mr. Rader for divesting himself of his assets. Mr. Rush submitted a proposal to St. Martin Bank for St. Lafayette Properties, L.L.C., hereinafter St. Lafayette, to purchase the Breaux Bridge store for a price equal to the total outstanding debt then owed by Norris Rader of St. Martin, Inc. The proposal required the bank to take title to the store by bidding it in at the sheriff's sale, which would wipe out a second mortgage on the store held by Do It Best, and then to sell the store to the newly formed L.L.C. under a credit sale. On January 13, 2003, Allan

1

Durand, attorney for St. Martin Bank, sent Mr. Rush a fax confirming the agreement between the bank and Mr. and Mrs. Rader that the bank would pre-sign a credit sale of the Breaux Bridge store to a new L.L.C., bid the store in at a Sheriff's sale, and then transfer title to the new L.L.C., provided the bank received $200,000 as a down payment, plus an escrow of the first year's interest on the note, plus Mr. and Mrs. Rader's personal guaranty of the new loan. Mr. Rush advised Mr. and Mrs. Rader that they could settle with St. Martin Bank, but that they had to put up $180,000. The Raders paid $180,000 to St. Lafayette on January 16, 2003, which Mr. Rush then paid to St. Martin Bank.

Mr. Rush formed St. Lafayette on December 18, 2002. Dan Menard was the sole member of St. Lafayette. While representing Mr. and Mrs. Rader, Redar and the QPRT, Mr. Rush also represented St. Lafayette and Dan Menard, the only identified member of St. Lafayette. Mr. Menard testified that Mr. Rush was the only attorney he and St. Lafayette used and Mr. Menard acknowledged that his handwritten notes evidenced his intent to pay Mr. Rush for his legal services out of the proceeds of the sale of property titled in St. Lafayette's name. The representation of St. Lafayette by Mr. Rush is also evidenced by Mr. Rush's letters dated December 15, 2003, and February 15, 2004, informing the Sheriff that St. Lafayette was his client. When the Raders tendered only $180,000, the bank agreed to make a side loan for the prepaid interest and insurance premium. Under these revised terms, St. Martin Bank required that Mr. and Mrs. Rader produce as additional collateral first mortgages on 500 plus acres of real estate in Iberia Parish formerly titled in their name, plus the $180,000 cash down payment.

At the sheriff's sale on January 15, 2003, the bank was the only bidder and took title pursuant to the sheriff's deed. Although the bank could have pursued a deficiency judgment against Mr. Rader for almost $700,000.00, the bank agreed not to and confirmed its agreement in writing prior to the sheriff's sale. The agreement was conditioned upon the Raders coming up with the required down payment and signing personal guaranties.

Mr. Rush advised the Raders that they should move the properties held by Redar and the QPRT to St. Lafayette. Plaintiffs contend that they were advised that this structure would help protect the properties from seizure by their creditors and allow time for the orderly sale of the properties to the extent necessary to pay their debts. The Raders testified that it was also their understanding of the arrangement with St. Lafayette that the properties would be returned to Redar once the litigation with Regions Bank was over. Mr. and Mrs. Rader signed documents transferring title to all the real estate owned by Redar and the QPRT to St. Lafayette, to be mortgaged to St. Martin Bank. Because five tracts were already mortgaged to Regions, St. Martin Bank agreed to accept as a substitute an additional cash down payment of $57,500.

2

The recited consideration was St. Lafayette's agreement to hold Redar and Mr. and Mrs. Rader harmless from their obligations on guaranties in connection with St. Martin Bank's lawsuit against Norris Rader Sr. and against Norris Rader of St. Martin, Inc. The Act of Conveyance also obligated St. Lafayette to contribute any cash required to buy the Breaux Bridge store from St. Martin Bank and to hold Mr. and Mrs. Rader harmless if St. Martin Bank required either or both of them to co-sign or guaranty St. Lafayette's note to the Bank. A counter letter was signed contemporaneously with the Act of Conveyance. The counter letter stated the only consideration received by the Raders was the consideration set forth in the Act of Conveyance.

On January 16, 2003, the Raders, as managers of Redar, had Redar transfer properties that it held to St. Lafayette. On January 29, 2003, Patsy Rader, as the trustee of the QPRT, transferred ownership of the family home to St. Lafayette as well. On February 6, 2003, Mr. Menard paid $57,500 to St. Lafayette, which in turn paid the money to St. Martin Bank to complete the release of Mr. and Mrs. Rader from the Norris Rader of St. Martin, Inc. debt and the purchase of the Breaux Bridge store. Upon sale of the Breaux Bridge property by St. Lafayette, the Raders' personal guaranties were extinguished.

In another suit against the Raders, they were able to settle a three million dollar judgment against them in favor of Regions Bank for $400,000.00. *See Regions Bank v. Norris Rader of Lafayette, Inc.*, 03-1665 (La.App. 3 Cir. 7/14/04), 879 So.2d 904, and *Regions Bank v. Norris Rader of Lafayette, Inc.*, 04-1505 (La.App. 3 Cir. 5/25/05), 904 So.2d 76. When the Raders were unable to pay the $400,000.00 to Mega Properties, who had purchased the litigious right from Regions, and Mega was threatening to foreclose on certain properties, Rush advised the Raders to file for bankruptcy. The Raders did, but the bankruptcy case was dismissed nine months later. Meanwhile, Rush arranged for two of his clients to take out loans from St. Martin Bank for $240,000.00 each. The proceeds of these loans were used to satisfy the $425,324.55 obligation to Mega and to pay Rush $54,675.45. Rush did not inform the Raders that the excess proceeds from the loan were used to pay his fees.

3

Rush also took out mortgages on property the Raders had transferred to St. Lafayette and Iberia to pay himself and to pay other debts.

In August 2006, the Raders discharged Rush. On October 19, 2006, Redar, the Rader QPRT, and the Raders filed this lawsuit seeking rescission of the transfer of the properties from Redar to St. Lafayette and a declaration that the transfer of the Rader family home was a nullity. On the Raders' motion, the trial court granted a preliminary injunction enjoining Iberia and St. Lafayette from disposing of former Redar property. Later, they amended their petition to include a malpractice claim against Rush. They also claimed that Menard was paid a usurious amount of interest. Rush sought to have the Raders evicted from the family home. Rush also filed a reconventional demand seeking attorney fees.

Following a trial, the trial court found Rush and his insurer, Greenwich Insurance Company, liable to the Raders in the amount of $446,904.36 plus interest for attorney fees paid but not earned. The trial court denied Rush's claim for more attorney fees. The trial court found that Patsy Rader was entitled to the use of the family home and the 9.97 acres on which it sat. The trial court denied the Raders' claims against Menard for usury and simulation. The trial court also dissolved the preliminary injunction, but did not award damages for wrongful issuance of an injunction. Finally, the trial court taxed certain fees as court costs and found Rush and Greenwich liable in solido for all costs of court.

The various parties have now filed three appeals, which have been consolidated in this court.

4

## ASSIGNMENTS OF ERROR

Docket number 09-1417

Appellants, St. Lafayette and Iberia, assert three assignments of error:

1.  The judgment failed to award damages and attorneys' fees to [St. Lafayette and Iberia] for wrongful issuance of injunctive relief.

2.  The judgment erroneously awarded exclusive rights of habitation and use to Patsy Marsalis Rader in excess of that permitted by law.

3.  The judgment failed to cast [the Raders] for costs incurred by [St. Lafayette and Iberia].

Answering the appeal, Redar, Rader QPRT, and Patsy Rader assert one error:

1.  The court erred as a matter of law in dismissing Redar's and the QPRT's claims to the properties based on judicial estoppel.

Docket numbers 10-46 and 10-308

Warren Rush, through his attorney, asserts six assignments of error:

1.  The trial court erred when it failed to recognize that the claims of the plaintiffs are prescribed/perempted.

2.  The trial court erred when it rendered a judgment contrary to the law and the evidence.

3.  The trial court erred when it awarded the return of attorney's fees to parties who did not pay attorney's fees.

4.  The trial court erred when it awarded recovery to parties having no interest in the property in dispute.

5.  The trial court erred when it awarded costs which are not recoverable.

6.  The trial court erred when it denied the Motion for New Trial and/or Judgment Notwithstanding the Verdict.

Greenwich asserts six assignments of error:

1.  The trial court erred in finding that the Greenwich policy covered the claims against Rush.

2.  The trial court erred in casting Greenwich solidarily liable with Rush in the amount of $446,904.36.

5

3.    The trial court erred in not finding that any legal malpractice claims brought by the plaintiffs in this lawsuit were perempted pursuant to La.R.S. 9:5605.

4.    The trial court erred in not granting Greenwich's Motion for New Trial.

5.    The trial court erred in casting Greenwich solidarily liable with Rush for all costs incurred by all parties in these consolidated suits.

6.    The trial court erred in its awarding of costs that were not sufficiently proven, and/or are not recoverable.

In response, Redar, the Rader QPRT, and Norris and Patsy Rader allege one error:

1.    The district court erred in concluding that Redar and the QPRT were not damaged by Rush's breaches because "the Raders were facing serious financial troubles and that the creditors were seeking judgments worth millions of dollars."

In a separate brief, the Raders argue that the judgment against Rush and his insurer Greenwich for malpractice should be increased to $1,268,612.50 or more, the value of the properties that Redar lost.

In a separate brief, Redar and Norris and Patsy Rader assert two assignments of error:

1.    The district court erred as a matter of law in concluding that the written agreement giving Menard the right to receive from the Raders twice the amount of money he paid on a loan, if the Raders failed to make the loan payment within seven days, was not usurious because it was a contract for carrying charges.

2.    The district court erred as a matter of law in concluding that neither Redar nor the Raders had a claim against Menard based on unjust enrichment for usurious interest and other amounts paid by a third party, Iberia, on account of Rader debts claimed but not owed to him.

Warren Rush also filed a brief on his own behalf and on behalf of Rush, Rush & Calogero, asserting two errors:

1.    The trial court erred in not granting Warren D. Rush a monetary judgment against Norris Rader, Sr. and Patsy Marsalis Rader for the sum

6

of $840,102.67 plus interest from date of Rush's original invoices to Norris and Patsy Rader, i.e. August 31, 2005 or alternatively, from the filing of the reconventional demand of Warren D. Rush, i.e. March 16, 2007, and for all costs incurred in the prosecution of the reconventional demand.

2. The trial court erred in not granting Warren D. Rush attorneys fees due pursuant to the notice given by Warren D. Rush to the said Raders according to La.R.S. 9:2781.

The Raders have filed a motion to strike a letter appended to a brief filed by Warren Rush and references thereto.

Warren Rush has filed a Motion to Remand, specifically as this appeal concerns his reconventional demand against the Raders.

## DISCUSSION

### Motion to Strike

In a brief to this court, Mr.Rush appended a letter he sent to the Raders on January 6, 2010, and referred to the letter in his brief. The Raders have filed a motion to strike the letter and references thereto contained in the brief. The letter was sent to the Raders after this appeal was pending in this court, and is not contained in the record on appeal. The motion to strike the letter is therefore granted, and we will not consider this letter, or any references to it, in evaluating the merits of this appeal. *See* La.Code Civ.P. art. 2164.

### Damages for Wrongful Issuance of a Preliminary Injunction

At the outset of this litigation, the trial court issued a preliminary injunction prohibiting St. Lafayette and Iberia from exercising possession or control of the properties at issue in this suit, from evicting the Raders from the family home, interfering with the lessees of the properties, and selling the properties. St. Lafayette and Iberia moved to dissolve the injunction and for damages, and the issue was tried

contemporaneously with the merits. At the conclusion of the trial, the court found that the properties at issue were owned by St. Lafayette and Iberia, and thus the injunction was dissolved. St. Lafayette and Iberia argue that the trial court should have awarded damages and attorney's fees for wrongful issuance of a preliminary injunction pursuant to La.Code Civ.P. art. 3608. Article 3608 states:

> The court may allow damages for the wrongful issuance of a temporary restraining order or a preliminary injunction on a motion to dissolve or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of a restraining order or preliminary injunction may be included as an element of damages whether the restraining order or preliminary injunction is dissolved on motion or after trial on the merits.

The language of the article is permissive, not mandatory. *Consultant Service Brokers, Inc. v. Housing Authority of City of Alexandria*, 428 So.2d 1336 (La.App. 3 Cir. 1983). The trial court's exercise of its discretion in deciding whether to award damages and attorney's fees pursuant to La.Code Civ.P. art. 3608 will not be disturbed absent an abuse of that discretion. *Id.*

St. Lafayette and Iberia argue that they suffered damages because they were unable to market the properties, resulting in foreclosure by St. Martin Bank and expenses related to that foreclosure in the amount of $56,230.30. While the evidence suggests that the trial court could have awarded damages and attorney's fees for wrongful issuance of the preliminary injunction, we cannot say that the trial court abused its discretion in declining to make such an award. This assignment of error lacks merit.

Use and Habitation of the Raders' Personal Residence

St. Lafayette appeals the trial court's judgment that Patsy Rader is entitled to the use and habitation of the Raders' residence and the entirety of the 9.97 acre tract

8

of land on which the residence is situated. St. Lafayette argues that Patsy Rader should only be entitled to the use of the family home and the 2.80 acre lot on which it is situated and not the 7.17 acre tract adjacent thereto. In addition, St. Lafayette argues that Patsy Rader never asked for anything more than a right of habitation of the residence, and the trial court's ruling expanding her pleadings to award exclusive use of the entire 9.97 acre tract was error.

While the petition does request only that Raders be allowed to remain in the family home and seeks to enjoin St. Lafayette from evicting them, the record in the trial court and the trial court's reasons for judgment clearly show that the issue of the scope of the right of habitation and use was clearly presented to the trial court for review. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading." La.Code Civ.P art. 1154. Thus, we move to the merits of this assignment of error.

In May 2001, Patsy Rader, the sole owner of the 9.97 acre tract and the improvements thereto, transferred the title of "the residence" to the QPRT. That document retained unto Patsy Rader "the right to use and occupy the residence as a personal residence" for fifteen years or until her earlier death. In the trust document, the residence is described as a "9.97 acre tract of land with improvements." When the Rader QPRT transferred the property to St. Lafayette, the property was burdened with a servitude of use and habitation created by the trust document. This right of use clearly extended to the entire 9.97 acres. We note that while the trust document does not explicitly grant Patsy Rader a right of habitation, its terms essentially grant that

9

right. ("Habitation is the nontransferable real right of a natural person to dwell in the house of another." La.Civ.Code art. 630.) Louisiana Civil Code Article 632 states:

> The right of habitation is regulated by the title that establishes it. If the title is silent as to the extent of the habitation, the right is regulated in accordance with Articles 633 through 635.

We find that the trust document clearly establishes the extent of the right in this case, and we need not resort to Articles 633 through 635 to determine the question before us. There is no error in the trial court's judgment.

Transfer of Property from the Raders to St. Lafayette

Norris and Patsy Rader appeal the trial court's determination that judicial estoppel bars them from seeking the rescission of the transfer of property from Redar and the family home from the Rader QPRT to St. Lafayette. The trial court found that the Raders judicially confessed in litigation with Regions Bank and in their personal bankruptcy case that they had transferred the property to St. Lafayette. It found that in deposition testimony, the Raders stated that they had no intention of having the property returned to them, and they failed to list the assets in their bankruptcy case. The trial court therefore found that the Raders were barred from pursuing their claims for simulation, lack of consideration, and nullity with respect to these transfers. In this court, the Raders do not contest the trial court's determination as to Norris and Patsy Rader. Instead, they argue that Redar and the Rader QPRT, as separate juridical entities, are not barred by judicial estoppel from making claims of simulation, lack of consideration, and nullity.

This record is replete with facts which demonstrate that Norris and Patsy Rader had personally guaranteed notes totaling over five million dollars and attempted, through a series of sham transactions, to shield their personal assets from seizure in

10

satisfaction of that debt. They now ask this court to reward their numerous attempts to use the legal system to hide assets. The underlying claims, which the trial court refused to consider, all amount to asking this court to recognize that transactions meant to deceive their creditors and the courts into allowing the Raders to avoid losing their property should now be reversed, and their property should now be returned to them. We will not countenance this outcome. We find that the "clean hands doctrine" is well-suited to the facts here before us. As we stated recently in *Griffith v. Latiolais*, 09-824, pp. 24-25 (La.App. 3 Cir. 3/3/10), 32 So.2d 380, 396, *reversed in part on other grounds*, 10-754 (La. __/__/__), ___ So.3d ___:

> [The "clean hands doctrine,"] which is alive and well in Louisiana, provides that "[a] person cannot maintain an action if, in order to establish his cause of action, he must rely in whole or in part, on any illegal or immoral act or transaction to which he is a part." *Allvend, Inc. v. Payphone Comm'ns Co., Inc.*, 00-661, p. 6 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 30.

We find that just as the Raders individually cannot attempt to misuse the courts of this state to accomplish illegal or immoral ends, neither can they bring those claims on behalf of separate juridical entities when the Raders (1) created those entities for the purpose of perpetrating the fraud and (2) retain complete control of both Redar and the Rader QPRT. The trial court did not err in refusing to consider the claims of simulation, lack of consideration, and nullity.

Malpractice

The supreme court explained the plaintiff's burden of proof in a legal malpractice claim in *Costello v. Hardy*, 03-1146, pp. 9-10 (La. 1/21/04), 864 So.2d 129, 138:

> To establish a claim for legal malpractice, a plaintiff must prove: 1) the existence of an attorney-client relationship; 2) negligent representation by the attorney; and 3) loss caused by that negligence.

11

*Finkelstein v. Collier*, 636 So.2d 1053, 1058 (La.App. 5 Cir.1994); *Barnett v. Sethi*, 608 So.2d 1011, 1014 (La.App. 4 Cir.1992), *writs denied*, 613 So.2d 993, 994 (La.1993).  A plaintiff can have no greater rights against attorneys for the negligent handling of a claim than are available in the underlying claim. *See, e.g., Spellman v. Bizal*, 99-0723, p. 11 (La.App. 4 Cir. 3/1/00), 755 So.2d 1013, 1019;  *Couture v. Guillory*, 97-2796, p. 7 (La.App. 4 Cir. 4/15/98), 713 So.2d 528, 532, *writ denied*, 98-1323 (La.6/26/98), 719 So.2d 1287.

We will not disturb the trial court's findings of fact unless they are clearly wrong or manifestly erroneous.  *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

The trial court clearly found that Rush committed legal malpractice in that he had numerous conflicts of interest in his dealings with the Raders and St. Lafayette and Iberia and he failed to communicate with the Raders.  The trial court found that the damages owed to the Raders would not, however, be measured by the value of the property lost by the Raders as a result of Rush's actions.  Instead, it found that Rush successfully proved that the Raders were facing serious financial troubles and that their creditors were seeking judgments worth millions of dollars, so they would have lost the property anyway.  As the Raders failed to prove an essential element of their claim for legal malpractice, the trial court necessarily found that the Raders could not recover for damages they did not incur as a result of the malpractice.  There is no manifest error in that factual finding by the trial court.

Our finding that the claim for legal malpractice failed pretermits a discussion of the assignments of error advanced by Rush and his insurer Greenwich regarding prescription/peremption.

Damages Awarded to the Raders

Instead, the trial court found that the only damages proven by the Raders were the amount that Rush overcharged them for the work that he did.  The court accepted David Rubin, an attorney, as an expert in the field of debtor or distress business

12

workout, bankruptcy, and the Rules of Professional Conduct. The Raders claimed that Rush charged them an excessive amount for the work he did in their case. Rush claimed the Raders failed to pay his fees, and filed a reconventional demand seeking $840,102.67 in attorney fees. The trial court found that Rush was paid $656,259.86 for his services. Relying on Rubin's testimony regarding his analysis of Rush's billing records, the trial court found that Rush was only entitled to receive $209,355.50 in attorney's fees. He found that Rush was unjustly enriched in the amount of $446,904.36, and awarded the Raders that amount.

We first address whether the trial court committed manifest error in its determination of the amount of fees Rush earned. While his billing statements indicated he was still owed $840,102.67 by the Raders at the time of trial, the trial court found that figure unreliable. The trial court found that Rush failed to bill the Raders regularly and when he did send a bill in November 2006, it contained numerous discrepancies. Rush charged for more that 24 hours in a single day. There were single time entries covering months at a time. He charged up to an hour and a half at $350 to fax a document. He billed several hours for drafting correspondence that was several sentences long. For example, Rush billed the Raders two and a half hours to send a two sentence fax on a day that Rush was out of the state. When the Raders confronted Rush about charging for more than twenty four hours in a day, he changed his records to delete the excess hours, but added exactly the same number of hours on different days. We agree with the trial court that the billing records introduced by Rush were unreliable in determining the amount of fees he was owed. We find no manifest error in the trial court's conclusion that Rush earned $209,355.50 in fees. Thus, we affirm the dismissal of Rush's reconventional demand.

13

Rush asserts that the trial court erred in awarding the Raders recovery when the Raders did not directly pay Rush. The supreme court explained the required elements of a claim for unjust enrichment in *Edmonston v. A-Second Mort. Co. of Slidell, Inc.*, 289 So.2d 116, 120 (La.1974):

> The *Minyard* [*v. Iowa Production*, 205 So.2d 422 (La.1967)] decision set forth five prerequisites which must be satisfied to successfully invoke the action: 1) There must be an enrichment; 2) there must be an impoverishment; 3) there must be a connection between the enrichment and the impoverishment; 4) there must be an absence of 'justification' or 'cause' for the enrichment and impoverishment; and 5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature.

The trial court found that the Raders paid Rush $175,350.00 between February 2003 and April 2005. Rush also received payments from four loans secured by mortgages on property formerly owned by the Raders totaling $355,103.73. Additionally, Rush received $125,792.13 from proceeds of the sale by Iberia of former Redar properties. The trial court attributed these last two amounts as payments made by the Raders. But at the time these payments were made to Rush, the Raders no longer had an interest in the properties mortgaged or sold, as they had been validly transferred to St. Lafayette and/or Iberia. Therefore, the Raders were not impoverished by these payments to Rush. We find the trial court erred in awarding damages to the Raders in the amount of $446,904.36.

As we find that Rush is not liable to the Raders for any amount, we pretermit a discussion of the coverage issues raised by Greenwich, with the exception of the issue of costs in the trial court, which we will discuss below.

Payments to Daniel Menard

The trial court's written reasons explain the facts which underlie this assignment of error:

14

According to Mr. Rush, the credit sale by St. Martin Bank to St. Lafayette was to be satisfied within twelve months. Unfortunately, the store could not be sold within that period of time, and the amount owed to St. Martin Bank and Trust Company went into arrears. Mr. Rush argued that it was clear that Dan Menard and St. Lafayette had taken on more risk than originally believed. At that point, steps were taken by the Raders and Mr. Rush to keep St. Lafayette from defaulting on the note. Mr. Rush advised Dan Menard that he would personally assume 50% of any debt that remained after the Breaux Bridge store was sold. Conversely, Mr. Menard agreed to pay Mr. Rush 50% of the profit, if any, he received upon the selling of the store. Defendants asserted that the foregoing agreement reduced Menard's risk and enticed him to continue marketing the property for a price sufficient to completely satisfy the bank. To further entice Mr. Menard to continue marketing the properties for a price sufficient to satisfy the debt to the bank, the Raders agreed that any future money Menard spent maintaining and marketing the store would be reimbursed to him on a two to one basis. Mr. Menard agreed to continue marketing the store holding out for a price sufficient to completely satisfy the debt owed to the bank.

The Agreement Reserving Right to Advanced Monies gave the Raders the first option to pay bills for insurance, interest payments, and taxes, but if they were unwilling or unable to pay those expenses, Menard would pay them with the understanding that he would be entitled to twice the amount he paid when the store property finally sold. The Raders argued that this represents a usurious interest rate, or in the alternative that Menard was unjustly enriched. The trial court properly found that Iberia, not the Raders, reimbursed Menard under this agreement. Therefore, the Raders have no standing to claim that the amounts paid to Menard were excessive. We affirm the judgment of the trial court dismissing the Raders' claims that Menard charged usurious interest rates or was unjustly enriched.

Court Costs

The trial court ruled that Rush and his insurer would be cast with all court costs. Citing La.Code Civ.P. art. 1920, St. Lafayette and Iberia argue that the trial

15

court erred in not assessing their court costs in successfully defending their rescission claims to Redar, the Rader QPRT, and the Raders. Article 1920 states:

> Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
>
> Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.

"It is well settled that a trial court has broad discretion in the assessment of court costs." *Davis v. Sonnier*, 96-515, p.19 (La.App. 3 Cir. 11/6/96), 682 So.2d 910, 920.

> It is the general rule that the party cast in judgment is taxed with costs of a proceeding, however, the trial court may assess the costs of a suit in any equitable manner and its assessment of costs can only be reversed by the appellate court upon a showing of an abuse of discretion.

*Esté v. State Farm Ins. Cos.*, 96-99, p.4 ( La.App. 3 Cir. 7/10/96), 676 So.2d 850, 859. It is clear from the record and the reasons for judgment that the trial court determined that Rush's actions were the reason for this litigation, and we cannot say the trial court abused its discretion in failing to cast the Raders with some portion of the court costs. This assignment of error lacks merit.

Rush and his insurer Greenwich appeal that portion of the trial court's judgment which awards as costs the expert witness fee and costs of David Rubin. Rush cites *Roy O. Martin Lumber Co., Inc. v. Sinclair*, 56 So.2d 240 (La.1951), for the proposition that as an officer of the court, an attorney may not be awarded an expert witness fee for testifying about the proper compensation of another attorney. In *State, through the Department of Transportation and Development v. Williamson*, 597 So.2d 439 (La.1992), the supreme court affirmed a judgment which fixed as costs the expert witness fees of two attorneys who testified as to the value of services

16

rendered by an attorney in an expropriation case. We find that the trial court did not abuse its discretion in taxing as costs the expert witness fee of David Rubin. Further, we find no abuse of discretion in the amount of the expert witness fee assessed as costs.

Finally, Greenwich alleges that the trial court erred in finding that it is liable in solido with Rush for the trial court costs. We find that the trial court abused its discretion in casting Greenwich liable for those costs. While it is clear that the trial court determined that the entirety of this litigation was spawned by the acts of Rush, the only damages it found Rush liable for were for excessive fees. While we have reversed that award, the insurance policy issued by Greenwich specifically excluded from coverage disgorgement claims. Thus, we reverse the judgment of the trial court insofar as it found Greenwich to be liable in solido with Rush for court costs.

Motion to Remand

We deny the motion to remand filed by Rush. The parties have had ample opportunity to litigate the claims raised in this appeal, and there is no need to remand this matter for further proceedings.

**CONCLUSION**

The motion to strike is granted. We reverse the judgment of the trial court awarding the Raders $446,904.36 for excess attorney fees paid to Rush. We also reverse that part of the trial court's judgment casting Greenwich with court costs. In all other respects, the judgment of the trial court is affirmed. The motion to remand is denied. Costs of the appeal in this court's docket number 09-1417 are assessed as follows: 50% to the Raders and 50% to St. Lafayette and Iberia. Costs of the appeals

17

in this court's docket numbers 10-46 and 10-308 are assessed to the Raders, Redar,

and the Rader QPRT.

**MOTION TO STRIKE GRANTED.**
**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**
**MOTION TO REMAND DENIED.**

09-1417 cw 10-46, 10-308

REDAR, LLC, ET AL.

VERSES

WARREN RUSH, ET AL.

**SAUNDERS, Judge, dissents**

I disagree with the portion of the majority opinion reversing the trial court's award to the Raders due to Rush's unjust enrichment. I feel that the Raders were impoverished by the actions of Rush. This whole scenario began because the Raders were in financial difficulties. They sought Rush's help. Following his advice, they transferred properties to various entities in order to try to alleviate their problem. Rush eventually charged what the trial court found to be excessive and unjust attorney's fees for these transactions. Although the Raders may not have actually paid these attorney's fees directly to Rush, they were impoverished relative to their financial position due to Rush charging and collecting excessive fees for his "work" performed during these transactions.

One striking example occurred when Rush arranged for the Raders to each take out a loan from St. Martin Bank for $240,000.00. The proceeds of these loans were used to satisfy the $425,324.55 obligation that the Raders had to Mega Properties and **_to pay Rush $54,675.45._** Although the finances used to pay Rush came from these loans, they were available due to the Raders delving greater into debt. Thus, it is difficult to understand how it can be found that these finances were not paid by the

Raders.

Moreover, Rush did not inform the Raders that the excess proceeds from the loans were used to pay his fees. In this one specific example, had Rush not unjustly charged these fees, the Raders would have been in a better position to solve their financial problems. It thus seems clear that the trial court had a reasonable basis to find that Rush was unjustly enriched at the expense of the Raders.