WILLIAMS, J.
_JjThe defendant, Samson Contour Energy E & P, L.L.C., appeals a judgment in favor of the plaintiff, Succession of Effie Connell. The trial court found that defendant owed the plaintiff the amount of $1,301,149.13 in royalty payments. Finding that the defendant’s failure to pay was wilful and unreasonable, the trial court rendered judgment awarding the plaintiff damages of double the amount of royalties due, legal interest and attorney fees. For the following reasons, we affirm.
FACTS
Effie Connell and her children, Billy Smith and Betty Smith Robinson, owned certain tracts of land and mineral interests in Section 8, Township 17 North, Range 9 West, Webster Parish. Their property was leased for oil and gas exploration in the early 1970s and those leases have been maintained by production. The royalty interest in the leases was owned ½ by Con-nell and 1/4 each by her children.
In May 1996, Connell executed an act of donation giving her undivided ½ mineral and royalty interest in the Section 8 property and wells to Billy Smith and reserving a lifetime usufruct on royalties produced from the Smith B-l and B-2 wells. Effie Connell died in January 2001, survived by her two children. In 2003, Samson Contour Energy E & P, L.L.C. (“Samson”), acquired an interest as lessee under the leases and became the leasehold owner *971 responsible for the payment of lease royalties.
Subsequently, Betty Robinson, the daughter of decedent, Connell, filed a petition to annul the May 1996 donation to her brother, Billy Smith. In April 2004, Samson was informed of the annulment action and suspended 12royalty payments for the ½ royalty interest in existing wells subject to the donation. In January 2005, the district court rendered judgment annulling the donation and ordering the transfer of the ½ mineral interest in Section 8 to the Succession of Effie Smith Connell (“the Succession”). In February 2005, Samson received an uncertified photocopy of the annulment judgment.
At the time of Samson’s suspension of royalties in April 2004, there were various wells in production in Section 8 pertaining to the disputed ½ Connell interest. Nevertheless, between June 2004 to February 2006, Samson drilled six new wells in Section 8 that were completed after its suspension of the disputed interest. However, in calculating the royalty payments for these new wells, Samson used its former ownership interest information for Section 8 by which Billy Smith and his assignees had been paid. As a result of Samson’s mistake, royalties attributable to the disputed ⅜ Connell interest and subject to the annulment action were erroneously paid to 'Billy Smith and his assignees, Mark Smith and Gary Smith. The royalty payments for those six wells during that time period totaled $1,301,149.13 and became the subject of this royalty payment dispute.
In June 2006, Mark Smith and Joe Robinson, co-administrators of the Succession, sent letters of administration to Samson and requested that royalty funds attributable to the Connell interest and held in suspense be paid to the estate of Effie Smith Connell. In a document titled “Transfer of Interest,” Samson acknowledged receiving the letters of administration and stated that its records had been updated to show that the royalty interest of |sConnell had been transferred to Effie Smith Connell Estate. Samson also assigned the Succession an owner number separate from Effie Connell’s individual number.
In July 2006, Robinson advised Samson that its email listing the wells in which the Succession owned an interest did not include the Section 8 wells. Samson replied that its records showed that the Connell estate did not own any interest in the production from the Section 8 wells and requested documentation showing such an interest. In response, Joe Robinson and Nelda Robinson Gremillion each separately sent Samson another copy of the annulment judgment and requested that Samson correct its records regarding the Section 8 wells.
On July 19, 2006, Samson posted on its website that a check in the amount of $946,237.88 for royalties would be issued to “Effie Holley Smith Connell Estate.” On this same date, Nelda Gremillion, a daughter of Betty Robinson, sent Samson written notice that the amount posted but not yet paid was less than half of the amount which the Succession’s accounting had estimated was due to the Succession for the Section 8 royalties alone. Gremillion informed Samson that it had made an error in accounting or in transferring the Section 8 wells to the Succession. Samson replied that it would research the matter. However, on July 25, 2006, Samson issued a check for the same amount previously posted. One week later, Joe Robinson, co-administrator of the Succession, and Gremillion traveled to Samson’s office in Tulsa. On August 3, 2006, Robinson hand delivered a letter notifying Samson of the royalty underpayment.
*972 |4In October 2006, Samson filed a con-cursus proceeding and monies- from the subsequent production of Section 8 wells began to be deposited into the registry of the court. By that time, Samson reported that 19 wells had been drilled in Section 8 affecting the Connell family lease rights. Samson named as defendants all of the heirs of Effie Connell, including Billy Smith, Gary Smith, Mark Smith, Rose McDonald, Joe Robinson, Nelda Gremillion and Peggy Robinson Brunson. Significantly, the disputed $1,301,149.13 in royalties attributable to six of the Section 8 wells from prior production were not identified in the October 2006 concursus filing. In May 2007, the Succession filed an action alleging failure to pay royalties by the defendant, Samson, and seeking cancellation of the mineral leases.
In September 2010, after the parties filed a joint motion for partial summary judgment, the trial court found that the Succession was the owner of the royalty interest. The court rendered partial summary judgment ordering that the funds deposited in the registry be disbursed to the Succession, closing the registry and reserving the parties’ rights to pursue their other claims.- In August 2012, Samson filed a motion to amend the concursus action to assert claims- against individual heirs. The court denied the motion.
At the 'start of trial in February 2013, the court granted a- motion to quash a subpoena duces tecum issued to the heirs, finding that the concursus was closed and the heirs were not before the court. Mark Smith, in his individual capacity, filed a motion in limine to preclude evidence regarding Samson’s claims' against the heirs of Connell. The trial court issued an | ¿injunction prohibiting Samson from filing any action against the heirs in any court until the current trial was completed. The trial was recessed until June 2013 for completion. When trial resumed, the court denied Samson’s exception of nonjoinder seeking to add Mark Smith as a party.
After a bench trial, the court issued an opinion finding that the Succession had given Samson sufficient notice of nonpayment of royalties under Article 137 of the Mineral Code and that Samson owed $1,301,149.13 in royalty payments. The court found that Samson’s payment to the heirs of royalties due to the Succession was not relevant because Samson was in the superior position to remedy the mistake after receiving notice from the Succession. The court further found that Samson’s failure to pay was not reasonable and that Samson was liable for damages of double the amount of royalties due. The court rendered judgment awarding the Succession $2,602,298.26 in damages, interest and $505,000 in attorney fees. Samson appeals the judgment.
DISCUSSION
Samson contends the trial court erred in finding that the Succession provided Samson with sufficient notice of improperly paid royalties under the Louisiana Mineral Code. Samson argues that notice was not sufficient because the Succession’s letter did not demand payment and failed to provide information so that payment could be made.
When a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, hé must give the lessee written notice of such failure as a prerequisite to a judicial demand for damages or ^dissolution of the lease. LSA-R.S. 31:137. The lessee shall have 30 days after receipt of the required notice to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment. LSA-R.S. 31:138. If the lessee pays the royalties due, and the original failure to pay was either fraudulent or *973 willful and without reasonable grounds, the court may award as damages double the amount of royalties due, interest and a reasonable attorney fee. LSA-R.S. 31:139. If the lessee fails to pay the royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, then the court may award as damages double the amount of royalties due, interest and a reasonable attorney fee, regardless of the cause for the original failure to pay royalties. LSA-R.S. 31:140.
The Official Comment to La. R.S. 31:137 states that Mineral Code Article 137 contemplates that any time there has been a nonpayment of royalties, the lessor must notify the lessee. This notice is not intended to be a demand for performance as in the case of the traditional default under the Louisiana Civil Code. Rather, the device of notice is merely to inform the lessee he has not paid royalties deemed by the lessor to be due. The total effect of the articles is to provide a spur to timely payment of royalties due while giving lessees a reasonable way to avoid the harsh remedy of cancellation. Rivers v. Sun Exploration & Production Co., 559 So.2d 963 (La.App. 2d Cir.1990); Lewis v. Texaco Exploration & Production Co., 96-1458 (La.App. 1st Cir.7/30/97), 698 So.2d 1001.
The trial court’s factual findings are subject to the manifest error standard of review. Stobart v. State DOTD, 617 So.2d 880 (La.1993).
|7In the present case, the Succession, co-administrators, Joe Robinson and Mark Smith, provided Samson with a certified copy of their letters of administration in June 2006, and requested that the royalties attributable to the estate of Connell be paid to the administrators at the listed address. On June 20, 2006, Samson acknowledged receipt of the letters and forwarded a list of the wells 'that had been transferred to the Connell estate. On July 5, 2006, Robinson informed Samson that the list of wells for which Connell’s interest was held in suspense did not include wells in Section 8. Samson then .asked for documentation showing that'the Connell estate owned an interest in the Section 8 wells. In reply, Robinson faxed a copy of the court’s decision annulling the donation of the minerals in Section 8 and ordering that this property interest be returned to the Succession. Samson then posted on its website the royalty to be paid to the Con-nell estate. •
On July 19, 2006, Gremillion sent an email informing Samson that the posted royalty amount payable to the Connell estate “is less than half of what our accounting estimates to be due for royalties payable for production in Section 8, Township 17 North-Range 9 West only." Gremillion stated that the Succession’s records showed that the royalty due and payable to the Connell estate for the Section 8 wells' alone was $2,119,730, and she attached a list of the wells at issue. Samson then issued a royalty check to the Succession for $946,237,88, despite the information that this amount was incorrect.
On August 3, 2006, Robinson hand delivered to Samson a letter regarding the Connell estate, .owner #265347, which stated in pertinent part:
| sThis letter also serves to notify you that the Estate of Effie Holley Smith Connell disputes the amount of royalty revenue paid to the estate by check #852979, dated July 25, 2006, in the amount-of nine hundred-forty-six thousand, two thirty-seven and 88/100 ($946,-237.88) dollars. You were contacted by email on July 19, 2006, by Nelda R. Gremillion. ' (See attached copies.) Your department has stated that the endorsement and/or deposit of this *974 check will in no way acknowledge resolution of the above stated dispute.
The letter also requested information regarding the formula used to calculate the royalty interest, the acreage included in Section 8 and a statement of Samson’s findings to resolve the dispute. The letter identified Robinson as a co-administrator of the Connell estate.
Contrary to Samson’s contention, Robinson’s August 2006 letter and the attached email did not simply ask for information, but also specifically notified Samson of the Succession’s claim that additional royalties were due for production in Section 8, identified the wells at issue and indicated that Samson may have made an error in transferring the Section 8 mineral interest back to the Connell estate after the 1996 donation had been nullified. Thus, the Succession’s written communication provided information to reasonably alert Samson of the claim that the royalty amount was not correct and to allow for an appropriate investigation of the problem. Consequently, we cannot say the trial court erred in finding that the Succession provided adequate written notice of Samson’s failure to pay royalties pursuant to Article 137 of the Louisiana Mineral Code.
In response to the Succession’s written notice, Samson did not pay any additional royalties. Samson’s attorney, Robert Human, replied in writing within 30 days of receiving the Succession’s notice. The letter in |9reply, dated August 28, 2006, neither stated a reasonable cause for nonpayment nor addressed the issue of Samson’s incorrect royalty payment. According to the testimony of Samson’s vice-president of operational accounting, Samson apparently never explained to the Succession before trial that the reason for the incorrect payment of royalties was because of Samson’s mistake in using an old “pay-deck” for the wells being drilled at the time Samson was notified of the annulled donation.
The conduct of Samson in this case is not similar to the situation of Matthews v. Sun Exploration & Production Co., 521 So.2d 1192 (La.App. 2d Cir.1988), in which the operator responded to the royalty owner’s notice by researching its records and informing the owner in writing that the available records indicated that the correct royalty had been paid. Here, in contrast, Samson’s August 2006 letter ignored the Succession’s dispute of the royalty amount, questioned Robinson’s authority to act for the Succession and answered only the requests for information. Such a response suggests that the writer did not review Samson’s own records, which contained an acknowledgment of receipt of the letters of administration appointing Robinson as a co-administrator of the Succession. Based upon this record, we cannot say the trial court erred in finding that Samson failed to either pay or respond with a reasonable cause for nonpayment within the required time period under Louisiana Mineral Code Article 138. Thus, we must consider the issue of damages.

Payment to Heirs

Samson' contends the trial court erred in treating the Succession as an | inowner of royalties separate from the heirs. Samson argues that it paid the royalties due to the heirs and the Succession has no basis for a separate recovery of those amounts because the Succession is not a separate juridical entity to which obligations are owed. •
A succession is an administrative process to transfer the estate of the deceased to his successors. LSA-C.C. art. 871. The estate of a deceased means the property, rights and obligations that a person leaves after his death. The estate includes not only the rights and obligations *975 of the deceased as they exist at death, but ail that has accrued thereto since death. LSA-C.C. art. 872. A succession representative is the proper party to exercise rights of ownership in assets of the deceased and to sue to enforce a right of the deceased. LSA-C.C. art. 938, Comment (g).
The authority cited by Samson in its brief does not support its contention that the royalty obligation Samson owed to the Connell estate under the lease was satisfied by the incorrect overpayments to other royalty owners, Billy Smith, Mark Smith and Gary Smith, the deceased’s heirs. Even though the estate is not a separate legal entity, Samson owed royalties under the mineral lease to the deceased, Connell, whose estate included the right to receive such royalties that became payable after her death.
Nor does the cited law allow Samson to choose to pay some heirs during the administration of an estate. LSA-R.S. 9:1516 provides that upon proper authority any holder of monetary proceeds from minerals or accrued mineral royalties payable to a deceased person under the terms of a mineral lease may pay the same to the deceased’s succession representatives or | nheirs. The letters of the succession representative or the judgment putting the heirs in possession, issued by a Louisiana court of competent jurisdiction, shall constitute proper authority for making the payment, which when so made shall be full protection to the holder. Certified, copies of the letters or judgment shall be conclusive proof to the holder. LSA-R.S. 9:1516(A).
Here, the Succession provided Samson with certified copies of the administrators’ letters of appointment. There has not been a judgment placing the heirs into possession of the estate’s royalty interest. Thus, Samson did not have proper authority to pay the royalties to anyone other than the succession administrators.
Samson also argues that the royalty payments to the heirs were authorized under the lease language stating that the lease provisions shall extend to heirs and successors. Although the lease provisions extend to heirs, successors and assigns, the lessee must make such payments in accordance with the applicable law. As noted above, under Section 1516, Samson’s payment of royalties to the heirs without the authority of a judgment of possession is not protected.
In addition, Samson argues that under Paragraph 10 of the mineral lease, Samson is not liable for failing to transfer the ownership 'interest back to the Succession after the donation was annulled because it was never provided with a certified copy of the judgment that nullified the donation. The lease states no change in the ownership of royalties “shall be binding upon lessee for any purpose until such person acquiring any interest has 112furnished lessee ... with a certified copy of the instrument or instruments constituting his chain of title from the original lessor.”
Similar lease provisions have been construed by the courts as relieving the lessee from the unreasonable, burden of constantly checking the public records for changes in ownership which may have occurred. Hibbert v. Mudd, 294 So.2d 518 (La.1974); Matthews, supra. In this case, Samson did. not need to check the public records because the Succession provided Samson with a copy of the judgment annulling the 1996 donation. That judgment ordered that the mineral interest involved be returned to the Succession. Thus, Samson received actual notice that the donation was null and the Connell estate was the owner of the royalty interest. Additional *976 ly, the record shows that the notice function of the lease requirement was fulfilled here because Samson changed its records for existing wells based on the uncertified copy of the judgment provided by the Succession.
Samson also complains that the judgment nullifying the donation was not recorded in the parish conveyance records. The public records doctrine provides .that an instrument involving immovable property shall be effective against third persons only from the time it is filed for registry in the parish where the property is located. LSA-C.C. art. 1839; LSA-C.C. art. 3338. Here, Samson is not a third-party purchaser, but is a party to the mineral lease. As noted above, Samson’s knowledge of the annulment judgment did not depend on the public records because it received actual notice of the. judgment. Samson’s argument lacks merit.
| Amendment of Concursus Petition
Samson contends the trial court erred in not allowing Samson to amend the concur-sus petition to assert claims against individual hems. Samson argues that an amendment should have been allowed because the partial summary judgment resolving the concursus reserved the rights and defenses of Samson for further proceedings.
A concursus proceeding is one in which two or more persons with competing claims to money are impleaded and required to assert their respective claims against other parties to the proceeding. LSA-C.C.P. art. 4651. The primary purpose of the proceeding is to protect the stakeholder from multiple liability, conflicting claims and involvement in litigation in which the stakeholder may have no direct interest. Cimarex Energy Co. v. Mauboules, 2009-1170 (La.4/9/10), 40 So.3d 931. The jurisdiction of the court is limited to disposing of the funds on deposit and relieving the stakeholder from further liability to the impleaded claimants arising out of the stakeholder’s possession of the fund. Chevron U.S.A., Inc. v. Oliver, 590 So.2d 1248 (La.App. 1st Cir.1991). The trial court has broad discretion to determine whether to disallow an amendment. Banks v. Parish of Jefferson, 12-215 (La. App. 5th Cir.1/30/13), 108 So.3d 1208.
In this case, Samson filed a concursus proceeding in October 2006, and deposited the royalties that became payable after that date into the court registry. The record' shows that the royalties in the amount of $1.3 million at issue here were not deposited into the court registry and were not involved in the concursus proceeding. When the court rendered the partial lusummary. judgment in September 2010, there was no dispute regarding ownership of the royalty interest or the deposited funds, and the district court correctly closed the concursus proceeding. Although the summary judgment included a reservation of the parties’ rights, there was no requirement that those claims be heard in the concursus proceeding. Based on this record, we cannot say the trial court abused its discretion in denying Samson’s motion to amend the concursus petition.
Samson also, contends the trial court erred in denying its exception of nonjoin-der after refusing to allow Samson to amend its concursus.petition. Samson argues that the court’s actions denied Samson due process of.law by preventing Samson from asserting claims of fraud and unjust enrichment against Mark Smith and Gary Smith.
Contrary to Samson’s argument, the record shows that Samson possessed the information necessary to assert these same claims against these same persons as early as October 2006, when the concursus was *977 filed, and no later than March 2007, when Samson’s attorney prepared a document specifying the amount of royalties incor--rectly paid by Samson and to whom. In addition, when the Succession filed the' lawsuit seeking the payment of royalties and cancellation of the leases in May 2007, Samson could have filed a third party claim against the persons who were mistakenly paid excess royalties, as did the lessee in Matthews, supra. Thus, the record does not support Samson’s complaint that it has been prevented from asserting' claims. These assignments of error lack merit.
| K5th Amendment Privilege
Samson contends the trial court erred in allowing Mark Smith to invoke the 5th amendment privilege against self-incrimination during his testimony.' Samson argues it is entitled to an adverse inference against the Succession because Smith refused to answer a question.
In a noncriminal proceeding, under exceptional circumstances in the interest of justice, if a claim of privilege is sustained, counsel may comment thereon and upon request the trier of fact may draw all reasonable inferences therefrom. LSA-C.E. art. 503. A court may apply an adverse presumption against the party asserting the 5th Amendment privilege in a civil case. Smith v. Lynn, 32,093 (La.App.2d Cir.8/18/99), 749 So.2d 692.
In the present case, Mark Smith’s separate counsel invoked the 5th Amendment on his behalf in response to the following question: “But you know you got checks and you know that you were not entitled to any royalties based on the interest that had been donated to you by your father after Judge Robinson’s ruling. Correct?” Despite not answering that single question, Smith testified that he owned a royalty interest separate from the 1996 donation, so. that he had received royalties before that donation and after the donation was annulled. Smith stated that he understood the owner decimal number printed on the royalty check detail as referring to the share of production from that property; but that he did not know why that number changed periodically. Smith testified that upon receipt, he briefly scanned and then deposited the royalty checks. Smith stated that he did not know at the time that any royalty. money was paid incorrectly and that he did not 11fiintend to receive an incorrect amount.
The record shows that the court allowed the assertion of the privilege based on an incident during settlement negotiations in which Samson’s attorney, Human, apparently threatened Mark Smith and other witnesses with criminal charges. Smith’s exercise of the privilege did not prevent Samson from obtaining testimony that Smith was paid royalties after the donation was annulled. Based upon this record, we cannot say the trial court abused its discretion in allowing Smith to assert his testimonial privilege. This assignment of error lacks merit.

Damages

Samson argues that the trial court erred in awarding penalties pursuant to the Louisiana Mineral Code because the Succession’s administrator, Smith, withheld information that he. had received excess royalties from Samson and then initiated'a lawsuit on behalf of the Succession to obtain royalty payments. Samson contends the clean hands doctrine does not permit the imposition of statutory penalties.
Louisiana Mineral Code Article 140 gives the trial court gréat discretion in awarding' damages of double the amount of royalties due, but does not mandate that any award be given in excess of the royalties due. O’Neal v. JLH Enter *978 prises, Inc., 37,432 (La.App.2d Cir.12/1/03), 862 So.2d 1021; Matthews, supra. Under the clean hands doctrine, a person cannot maintain an action if, in order to establish his cause of action, he must rely on any illegal or immoral act or transaction to which he is a part. Redar, L.L.C. v. Rush, 09-1417 (La.App. 3rd Cir.11/17/10), 51 So.3d 859.
|17In this case, Samson has not shown that Mark Smith knowingly received excess royalties during the period after the 1996 donation was annulled. To the contrary, Smith testified that he did not intend to receive an incorrect amount. Further, Samson had communicated to the Succession that royalties for the Connell estate’s interest in all wells had been suspended, even though Samson had been incorrectly paying royalties based on the annulled donation for the six new wells in Section 8.
Nor has there been any showing that the Succession was opened for a fraudulent purpose. Although Samson complains about Smith’s alleged lack of disclosure, there is no indication that the Succession’s other administrator, Robinson, received any excess royalties or made any misrepresentations in notifying Samson of the incorrect royalty payment. Based upon this record, Samson has failed to show that the clean hands doctrine is applicable.
The evidence presented at trial shows that Samson failed to follow industry practice in using old information for paying royalties and not adjusting royalty payments after the mistake was discovered. Warren Martindale was accepted as an expert in oil and gas accounting, including the industry practices for the suspension and payment of royalties. Martindale opined that after suspending the Connell interest, Samson should have “flagged” the leases so that any new wells completed would also have been suspended. Martin-dale testified that in his experience, once a lessee determined that an interest owner was paid too much, the standard accounting practice would be to “reverse and rebook,” meaning that for [ 18each production month, payment entries for the overpaid owner would be reversed, creating a credit, and the payments would be rebooked to the correct owner. Martindale explained that the lessee would then recoup the credits from the overpaid owner through future production. Martindale testified that Samson had not followed this practice.
Samson argues in its appellate'brief that penalties should not have been imposed because Mark Smith failed to disclose his receipt of excess royalties. However, this argument disregards Samson’s duty as lessee under the Louisiana Mineral Code to pay or respond with a reasonable cause for nonpayment within 30 days after receiving notice that the amount of royalties paid was incorrect. In August 2006, Samson was informed by the Succession that a mistake had been made regarding the Section 8 wells at issue, but Samson failed to investigate its records and pay the proper mineral owner the royalty amount due.
The trial court considered the evidence and weighed the credibility of the witnesses. Based upon the evidence contained in this record, we cannot say the trial court erred in finding that Samson’s failure to pay royalties to the Succession was unreasonable. Thus, the trial court’s award -of double the amount of royalties due as damages was not an abuse of discretion. The assignments of error lack merit.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to Samson Contour Energy E&P, L.L.C.
AFFIRMED. .